THE STATE *v.* NASHVILLE BASEBALL ASS'N.

(*Nashville.* December Term, 1918.) ·

1. **SUNDAY.** Prohibition of baseball. Statute.

Shannon's Code, section 3029 (Acts 1803, chapter 47, section 1), making it an offense for any merchant, artificer, tradesman, farmer, or other person to exercise any of the common avocations. of life on Sunday, etc., does not prohibit the playing of professional baseball on Sunday; the game not having been in existence when the statute was enacted. (*Post, pp.* 457-465.)·

Acts cited and construed: Acts 1803, ch. 47, sec. 1.

Cases cited and approved: State v. Prather, 79 Kan. 513; McCreary v. First National Bank, 109 Tenn., 128; Stockley v. Cissna, 119 Fed., 812; Goodwin v. Thompson, 83 Tenn., 209; Ex parte Neet, 157 Mo., 527.

Cases cited and distinguished: Territory v. Davenport, 17 N. M., 214; Ex parte Roquemore, 60 Tex. Cr. 282.

Code cited and construed: Sec. 3029 (S.).

2. **STATUTES.** Contemporaneous construction.

Shannon's Code, section 3029 (Acts 1803, chapter 47, section 1), making it an offense for any merchant, artificer, tradesman, farmer, or other person to exercise any of the common avocations of life on Sunday, etc., having been construed by the legislature, the legal profession, and the public generally not to prohibit the playing of professional baseball on Sunday, will not be held to ·do so by the supreme court. (*Post, pp.* 465, 466.)

3. **SUNDAY.** Prohibition of professional baseball. Statute.

Shannon's Code, section 3031 (Acts 1803, chapter 47, section 2), subjecting to the same proceedings and penalty as those who work on the Sabbath any person who shall hunt, fish, or play at any game of sport on Sunday, does not prohibit the playing of pro-

fessional baseball; the game not having been in existence when the statute was enacted. (*Post, pp.* 466-468.)

Case cited and approved: Graham v. State, 134 Tenn., 285.
Code cited and construed: Sec. 3031(S.).

---

FROM DAVIDSON.

---

Appeal from the Circuit Court of Davidson County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.— HON. R. E. BLAKE, Special Judge.

FRANK M. THOMPSON, Attorney-General, and JAMES L. WATTS, for the State.

CHERRY & STEGER, for defendants.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

The petition filed in this case sought to enjoin the defendant from playing baseball on Sunday, in Tennessee, and to have its charter forfeited.

The circuit judge dismissed the petition, and on appeal the court of civil appeals reversed the lower court and perpetually enjoined the defendant from playing ball on Sunday, in Tennessee, but declined to decree a forfeiture of its charter.

The case is before us by petition for writ of *certiorari.*

The court of civil appeals held that it was unlawful to play baseball in Tennessee on Sunday, and based

its holding on chapter 47, section 1, of the Acts of 1803, section 3029 of Shannon's Code, which is as follows:

"If any merchant, artificer; tradesman, farmer, or other person shall be guilty of doing or exercising any of the common avocations of life, or of causing or permitting the same to be done by his children or servants, acts of real necessity or charity excepted, on Sunday, he shall, on due conviction thereof before any justice of the peace of the county, forfeit and pay three dollars, one-half to the person who will sue for the same, the other half for the use of the county."

It, therefore, becomes necessary for us to construe this statute with a view of determining whether the same applies to playing baseball.

In 7 Corpus Juris, p. 932, note (a), the origin of baseball is thus stated:

"In a prosecution for playing baseball on Sunday, brought under a statute providing that persons convicted of horseracing, cockfighting, or playing at cards or any game of any kind on Sunday should be guilty of a misdemeanor, one of the reasons suggested for holding that the statute was not to indicate baseball was that when the statute was adopted the game was unknown. In referring to this suggestion the court said: 'Until very recently there has been more or less controversy as to the early history and origin of baseball, some contending that it is only a modified form of the English game of rounders. In order to settle the dispute a special baseball commission was appointed, consisting of a number of eminent men. Their report was published in 1907, and the commission, after full investigation, unanimously decided that baseball is dis-

tinctively an American game; that it originated in Cooperstown, New York, in 1839, and that the first scheme for playing it was the invention of Gen. Abner Doubleday, who afterwards graduated from West Point and achieved honorable distinction in the Civil War. The rules of the game as first published by the Knicker- bocker Club of New York in 1845 differ only in a few minor details from those of the modern game. Baseball. was first played by regular clubs in 1845, and while it had begun to attract attention in the '50's it did not become a common form of sport or exercise and was not generally played until 1865. The first professional club was organized for playing it in 1868." *State* v. *Prather*, 79 Kan., 513, 100 Pac., 57, 21 L. R. A. (N. S.), 23, 131 Am. St. Rep., 339.

So that, it appears that, at the time of the passage of the act in question, the game of baseball had not been invented and was unknown, and hence the legislature could not possibly have had such a game in mind at the time it passed said act.

"Intention is the cardinal rule, in the construction of statutes." 11 Encyclopedic Digest, 529, where many cases are cited.

"It is a settled rule that penal statutes are to be construed strictly, and are not to be extended beyond the plain letter of the law." *McCreary* v. *First National Bank*, 109 Tenn., 128, 70 S. W., 821.

Now, what was the legislative intent in the passage of this statute? The statute says, "If any merchant, artifi- cer, tradesman, farmer, or other person shall be guilty of doing or exercising any of the common avocations of life," etc. Evidently the legislature intended to in-

hibit any one from "exercising any of the common avocations of life on Sunday," and unquestionably it referred to, and the legislature had in mind, the common avocations of life engaged in by the people at that time. The legislature did not undertake to enumerate them—it was unnecessary, as they were commonly known and understood by the people, but they indicated what they had in mind by specifically mentioning merchandising; one who does artistic work, a mechanic or manufacturer; a trader and a farmer, and, speaking historically, this practically included all of the common avocations of that day.

If you undertake to extend the statute to the many avocations that have since come into vogue, and which the legislature could not have had in mind, you are confronted with very serious problems, the result being that a very large number of our industrial and pleasurable operators are persistent violators of the statute. The thousands of men engaged in operating our railroads, traction companies, taxicabs, publishers of Sunday newspapers, the boys who vend these papers, bootblacks, musicians whose avocations as members of a band play in our city parks on Sunday afternoon for the entertainment of the large number of people who frequent such places for fresh air and sunshine, and even the professional musician, who sings as an avocation, and who hires himself to one of our church choirs and sings in church Sunday after Sunday—all of these are violators of the statute, and many other examples could be cited.

So that, when you undertake to give this statute a broader meaning than was intended by its framers, and

than a strict construction entitles it to, you are making law violators out of many of our citizens, and they are innocent offenders at that; and, furthermore, the question as to whether a particular act is a violation of the statute will depend largely on the personal views of the particular jurist making the application. One might consider it a violation while another would not, and the result would be that the law would not be uniform, fixed and certain.

The state of New Mexico had a statute (passed in 1897 [Comp. Laws, section 1368]) reading as follows:

"Any person or persons who shall be found on the first day of the week engaged in any sports or in horseracing, cockfighting, etc., or engaged in any labor, except works of necessity, charity or mercy, shall be punished."

"In construing this act, in *Territory* v. *Davenport*, 17 N. M., 214, 124 Pac., 795, 41 L. R. A. (N. S.), 407, the court said.:

"By the use of the words 'horseracing and cockfighting' the legislature pointed out the class of sports which it intended to prohibit, and baseball, not being in the same class of sports, is not prohibited."

And so, in the instant case, you could hardly classify baseball playing with merchandising, manufacturing, trading, and farming.

The state of Texas has a statute (Pen. Code 1895, art. 199) as follows:

"Any merchant, grocer, or dealer in wares or merchandise, or trader in any business," etc., "or the proprietor of any place of public amusement, . . . who shall sell, barter or permit his place of business or

place of public amusement to be open for the purpose of traffic or public amusement on Sunday, shall be fined,'' etc.

The law further defines a place of public amusement to include circuses, theaters, variety theaters, and ''such other amusements as are exhibited and for which an admission fee is charged.''

A game of baseball was played in a baseball park on Sunday, and an admission fee was charged. An indictment followed and it was contended that the language used included baseball. The doctrine of *ejusdem generis* was invoked. But the supreme court said:

''It is elementary before a citizen can be punished as a criminal that the offense must clearly be defined by the statute, and an appropriate penalty affixed. . . . Further, it is a rule of construction well known that, in undertaking to fix and place the meaning u' on statutes, we should do so in the light of contemporaneous history, and in reference to the habits and activities of our people. It is known, of course, that baseball is the most generally practiced, patronized, and approved of all the games of exercise, and that it is the cleanest and fairest of all manly sports and excites rivalry in the youths in our land, and that every village and hamlet has its favorite nine, and . . . many ambitious youths who dream of the day when they shall equal if not excel Matthewson, Speaker, Cobb, Napoleon, Lajoie, and Honus Wagner. It is also well known that for many years, in many of our largest cities, baseball on Sunday has been not only frequently, but continuously, played, where an admission fee is charged. Now it would have seemed, in the light of these facts, that, if

it had been the legislative intent to condemn this form of amusement and include it within the statute under consideration, it would have been an easy matter to have done so in express words, and not left the matter at least clouded in doubt. Again, it is worthy to be remembered, as a part of the political history of the times, that many efforts have been made within the last few years in the legislature to make the playing of baseball on Sunday an offense without success. It would seem that, if it were already an offense, these efforts would not have been put forth.'' *Ex parte Roquemore,* 60 Tex. Cr., 282, 131 S. W., 1101, 32 L. R. A. (N. S.), 1186.

The question of legislative intent is forcefully illustrated in the case of *Stockley* v. *Cissna,* 119 Fed., 812, 56 C. C. A., 324, and approved by this court in the same styled case in 119 Tenn., 135, 104 S. W., 792.

The facts of the Stockley Case, briefly, are these: By an avulsion in 1876, the Mississippi river left its bed, on the Tennessee side, and flowed through a new channel. A few years later this old bed became dry land. In 1901 Stockley, by virtue of chapter 20 of the Acts of 1847-48, entered and obtained a grant to a part of this old bed, which was the property of the State of Tennessee when the act of 1847 was passed. The act of 1847 provided that after September 1, 1849, any person might enter any of the vacant and unappropriated lands in the State. This particular land had belonged to the State all these years, and was vacant and unappropriated at the time Stockley made his entry, but the court held that Stockley acquired no title; that the land was not subject to entry and grant under the act of 1847,

although the property of the State, for the reason, that this land was covered by the water of the river at the time the act was passed, and that this land was not in the mind of the legislature at the time said act was enacted.

Judge LURTON, speaking for the court, said:

"The situation is one which could not have been reasonably contemplated by the lawmaker, when providing for the ordinary vacant lands belonging to the public domain. The lands in question were not at the date of the act of 1847 within the meaning and purview of the makers of the law, because it was the policy and purpose of the state [*Goodwin* v. *Thompson,* 15 Lea, 209, 54 Am. Rep., 410] to reserve for the public use the beds of such navigable rivers."

"Not having been within the meaning of the Tennessee acts which provided for the disposition of the unoccupied and ungranted land of the State at the time these acts were passed, the *locus in quo* had not been brought within the terms of these acts by the subsequent extraordinary physical change which had occurred. The dry river bed is public property, held by the State for public purposes, and some further legislation by the State is necessary before such a property will become open to private ownership."

And so in the case we are considering further legislation is necessary in order to deal with a state of affairs that did not exist at the time of the passage of the act of 1803.

When Stockley obtained his grant in 1901, the act of 1847 was still in force. If this latter act did not apply to the land entered by Stockley, because not

within the contemplation of the legislature, neither did the act of 1803 apply to baseball, because baseball was not in the mind of the legislature when the act was passed.

In the State of Missouri there was a statute relating to work and labor and the playing of games on Sunday, under which a man was indicted for playing baseball on Sunday, and the court said:

"Section 2242, Revised Statutes 1899, has been on the statute books of Missouri, in exactly the same words, ever since 1835 . . . Playing a game of baseball on Sunday . . . could not have been in the minds of the lawmakers when this provision of law was enacted in 1835, for the very simple reason that such a game was wholly unknown to art at that time." *Ex parte Neet,* 157 Mo., 527, 57 S. W., 1025, 80 Am. St. Rep., 638.

Kansas passed a statute in 1855 forbidding the playing "of games of any kind" on Sunday. The supreme court held that the statute did not apply to baseball, and, referring to the Missouri holding, said:

"The same reason applies with almost as much force to our statute . . . adopted in 1855." *State* v. *Prather,* 79 Kan., 513, 100 Pac., 57, 21 L. R. A. (N. S.), 23, 131 Am. St. Rep., 339.

We have not been furnished, and have been unable to find, a single case holding a statute of this character, passed prior to the date that baseball became known, applicable. And even as to similar statutes passed in recent years the weight of authority seems to hold that they do not apply to baseball.

There is another potent reason why the statute does not apply. This act was passed one hundred and sixteen

years ago, and no attempt has been made to apply it to baseball until very recently. The legislature, the legal profession, and the public generally seem to have understood that it had no application to baseball, and in 1885 an act was passed by the legislature making Sunday ball playing a misdemeanor, which act was declared unconstitutional by this court. Both before and since that time attempts have been made to have the legislature enact such a law, but without avail, which is a recognition of the fact that the act of 1803 does not prohibit the playing of baseball on Sunday.

It is the duty of this court to interpret and enforce laws and not to make them, that being the province of the legislature, and, if the legislature thinks that the playing of baseball on Sunday is injurious to the morals or welfare of the public, they can make Sunday ball playing prohibitive.

The second section of chapter 47 of the Acts of 1803, Shannon's Code, section 3031, is as follows:

"Any person who shall hunt, fish, or play at any game of sport, or be drunk on Sunday as aforesaid, shall be subject to the same proceedings, and liable to the same penalties, as those who work on the Sabbath."

The court of civil appeals did not rest its decision on this section of the act, and the State has not raised this question by writ of *certiorari*. However, what we have said as to the other section applies as well to this one. "Play any game of sport" did not include baseball, because it was unknown at the time, and was not within the contemplation of the legislature.

The games of sport common in those days were horse-racing, cockfighting, and gambling with cards, and

most of the statutes passed one hundred years age, specifically mentioned these three things. This provision of the statute evidently was not intended to apply to every little innocent game. Although, on the statute book for one hundred and sixteen years, we have never heard of any insistence being made that the statute prohibited such games as marbles, checkers, tennis, croquet, golf, proverbs, Bible games, and many other innocent games that could be enumerated. From the only authorities that we have been able to find it appears that similar statutes have always been construed as applying to wagering or gambling games. Strange to say that this provision of the act, although a very ancient one, has never been construed by this court, at least in a published opinion.

It is insisted, however, that this court took a contrary view in the case of *Graham* v. *State,* 134 Tenn., 285. 183 S. W., 983. In that case it seems to have been taken for granted that the statute applied, and the only question raised was one of jurisdiction, it being insisted that, under the statute, justices of the peace had exclusive jurisdiction, and the question which has been raised, and which we have been considering in this case, was not invoked in that case. However, that case can be distinguished from this one. The gravamen of the offense in the Graham Case was operating a theater on Sunday where moving pictures were shown. If it had been vaudeville, or a musical comedy, instead of exhibiting pictures, the result would have been the same. Showing moving pictures is not the gravamen of the offense, otherwise many of our leading ministers would

be violating the law when they illustrate their Sunday night sermons with moving pictures.

At the time of the passage of the act of 1803, operating theaters was one of the common vocations, and one that was looked upon by many as being immoral, and hence, operating a theater, regardless of the character of the entertainment, would fall within the statute.

We are therefore of the opinion that playing baseball on Sunday is not unlawful in Tennessee. It results that the writ of *certiorari* is granted. The decree of the court of civil appeals will be reversed, and the decree of the circuit court will be affirmed. The complainant will pay the costs.

Justice HALL, being incompetent, did not participate in the decision of this case.